## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 19-CV-62071-MORENO/STRAUSS

**MARY BETHEL,**

      Plaintiff,

v.

**ANDREW SAUL,**
**Commissioner of Social Security Administration,**

      Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS MATTER came before the Court upon Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion") (DE 18) and Defendant's Motion for Summary Judgment ("Defendant's Motion") (DE 19). This case was referred to the undersigned for a ruling on all pre-trial, non-dispositive matters and for a report and recommendation on any dispositive matters (DE 9; DE 10). The undersigned has carefully reviewed the motions (DE 18; DE 19), the response (DE 20), the reply (DE 21), and the record in this case. Being otherwise duly informed, for the reasons discussed herein, the undersigned **RECOMMENDS** that Plaintiff's Motion (DE 18) be **DENIED** and that Defendant's Motion (DE 19) be **GRANTED**.

## BACKGROUND

### I.    PROCEDURAL HISTORY

Plaintiff applied for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") on August 6, 2015, alleging disability as of May 16, 2012 ("Alleged Onset Date"). Tr. 15. The applications were denied initially on September 16, 2015, and upon reconsideration on January 5, 2016. Tr. 15. Thereafter, Plaintiff appeared with counsel at a hearing before an

Administrative Law Judge ("ALJ") on June 14, 2018; a vocational expert ("VE") also appeared and testified. Tr. 31-70. On June 27, 2018, the ALJ issued his decision finding that Plaintiff was not "disabled" under the Social Security Act through the date of the decision. Tr. 15-23. This period included the date of December 31, 2017, which is the date that Plaintiff last met the insured status requirements of the Social Security Act ("Date Last Insured"). Tr. 15. On June 18, 2019, the Appeals Council of the Social Security Administration denied Plaintiff's request for review, thereby leaving the ALJ's decision as the final decision of the Commissioner. Tr. 1-5. Consequently, on August 19, 2019, Plaintiff filed this action seeking judicial review of the Commissioner's decision.

## II.   FACTS

### A. Plaintiff's Background

Plaintiff was born on August 19, 1963 and was forty-eight (48) years old on the Alleged Onset Date, which is defined as an individual approaching advanced age. Tr. 21. She has at least a high school education and can communicate in English. *Id.* Based on Plaintiff's description of her work history, the VE testified that Plaintiff performed past relevant work as a vocational rehabilitation counselor. Tr. 62.

### B. Medical Evidence

On May 3, 2011, Plaintiff underwent spine surgery – cervical (neck) corpectomy and fusion from the C4 through T1 levels. Tr. 366. According to the surgeon, John A. Coats, M.D., Plaintiff was expected to heal surgically from the fusion in five (5) to six (6) months and to achieve full clinical recovery in six (6) to twelve (12) months. Tr. 368, 372. Medical notes, dated May 9, 2011, indicate that Plaintiff would require physical therapy. Tr. 368. Further, the notes estimated

2

that Plaintiff would be able to return to work in three (3) to six (6) months from the surgery date. Tr. 368.

On February 6, 2012, Dr. Coats saw Plaintiff for a follow-up examination. Dr. Coats noted that, while Plaintiff had "a rough time" following the operation, she had made substantial improvements. Tr. 483. Dr. Coats also noted that Plaintiff indicated a full range of motion. Tr. 483. Further, occasional left leg stiffness in the morning was worked out with a few walking steps. Tr. 483. Additionally, Plaintiff had no neck pain, intact strength, and her gait was normal. Tr. 483. Dr. Coats stated that Plaintiff was not requiring any medications and was back to work full time. Tr. 483. Plaintiff agreed with Dr. Coats that she did not need any physical therapy. Tr. 484.

The next medical records available for review indicate that Plaintiff sought treatment, on August 19, 2015, at Sands Chiropractic Clinic for neck and mid and lower back pain and was examined and treated by Charles Tracy Sands, D.C. Tr. 508. Dr. Sands reported Plaintiff had restricted and painful spinal range of motion to cervical right/left rotation and extension and lumbar extension. Tr. 508. He treated Plaintiff and recommended stretching and range of motion exercises with ice as needed noting, that Plaintiff should avoid prolonged sitting and standing and any compressive loading to the lower back. Tr. 508.

During 2015, Dr. Sands saw Plaintiff on August 26th, September 23rd, September 30th, November 13th, November 18th, and December 9th. Tr. 502-07. The November 13th visit was prompted by "increased middle back pain after lifting her mother a few days [prior]." Tr. 504. At the latter November and December visits, Dr. Sands reported that Plaintiff's pain had moderated significantly. Tr. 502-04. Notes from the December 9, 2015 visit stated that Plaintiff was "over all improved with lingering pain at lumbosacral [(lower back)] level." Tr. 502.

3

On September 11, 2015, Stanford A. Williamson, D.O., conducted a consultative examination of Plaintiff.  (Tr. 496-501).  At the examination, Plaintiff alleged, *inter alia*, "spine pain, pain at the knees and right eye problems."  Tr. 498.  Dr. Williamson recorded Plaintiff's description of her medical history relating to her right eye problems as follows:

> During 2006, [Plaintiff] reports the sudden onset of severe right orbital headache which lasted several days.  By day ten, there was gradual progressive haze at the eye.  She states, "In a matter of four days I literally went blind at my eye."  She sought out care.  A diagnosis of optic neuritis was given.  Workup returned negative for multiple sclerosis.  The majority of the vision returned over the following year.  She continues with a veil of a "white shade."  She has a difficult time with reading.  She states, "I have a hard time seeing anything detailed."

Tr. 498.  Following examination of Plaintiff, Dr. Williamson observed that sclerae (eyeball whites) were not injected (appearing red from illness or injury), EOMs (extraocular movements) were intact bilaterally, there was no nystagmus (eye movement that may lead to reduced vision), and that peripheral fields appeared intact.  Tr. 499.  In his neurological assessment, Dr. Williamson noted Plaintiff's "described vision deficits" and stated that "otherwise, cranial nerves appear to be grossly intact" (facial function was symmetric).  Tr. 499.  Dr. Williamson also recorded Plaintiff's visual acuity with corrective lenses at 20/30 for both the left and right eyes.  Tr. 499.

Regarding Plaintiff's spine, Dr. Williamson noted "a well-healed surgical scar at the anterior neck."  Tr. 499.  Further, Dr. Williamson recorded that Plaintiff had ROM (range of motion) deficits at the cervical (neck) spine with recordings as follows: forward flexion (chin lowered to chest) at least 75% of normal, extension (looking upward) at least 10% of normal, lateral flexion (movement of head to shoulder) at least 5% of normal for both right and left movements, and rotation (moving head to face left or right) at least 45% of normal for both right and left movements.  Tr. 496, 499.  Lumbar spine range of motion recordings were: forward flexion (bending forward) normal, extension (bending back) at least 5% of normal, and lateral flexion (bending to the side) at least 10% of normal.  Tr. 496.  Dr. Williamson further observed that

Plaintiff's iliac crest (hip bone) was elevated at the left and that Plaintiff's left lower extremity was at least 2 centimeters longer than her right lower extremity.  Tr. 499.  Dr. Williamson noted positive tenderness at the sacral sulci (sides of the bone at the end of the spine).  Tr. 499.  Also, Plaintiff exhibited anterior carriage of the head (misalignment of head with neck and shoulders) with positive tenderness at the articular pillars (part of the cervical or neck vertebrae) and at the midline at the cervicothoracic (neck and chest) junction.  Tr. 499.

Range of motion pertaining to Plaintiff's shoulders, elbows, wrists, hands, knees, ankles, and toes was normal, and there were no range of motion deficits at upper or lower extremities. Tr. 496-99.  Plaintiff's grip was normal, the pinch was normal, opposition was intact and there was no atrophy, erythema (redness of skin) or edema (swelling) at the limbs.  Tr. 499.  However, Plaintiff exhibited positive medial joint line tenderness at the knees.  Tr. 499.

Nonetheless, Dr. Williamson stated that Plaintiff reported that she was able to function independently relative to: "feeding, using public transportation, performing personal hygiene, managing funds, buttoning and unbuttoning shirts and pants."  Tr. 498.  In this regard, Dr. Williamson also observed that Plaintiff drove herself to the consultative examination.  Tr. 498.

Following a physical examination, Dr. Williamson observed that Plaintiff was cooperative and did not appear acutely ill.  Tr. 499.  She held a pen without difficulty to sign her name and picked up a sheet of paper without difficulty using each hand.  Tr. 499.  Plaintiff also transferred independently and ambulated independently without an assistive device and answered and reacted appropriately to questions and directions.  Tr. 499.

Dr. Williamson additionally noted that Plaintiff had 5/5 strength grossly at upper and lower extremities with sensation grossly intact to light touch throughout.  Tr. 499.  Furthermore, Dr. Williamson observed that Plaintiff was able to perform standing on her toes and on her heels and

able to perform tandem walking.  Tr. 499.  A sitting straight leg raise was negative (no pain or systems were produced on opposite leg).  Tr. 499.  Also, reflexes were 2+ (normal) at bilateral biceps, brachioradialis (forearm muscle), and patella tendons (connects kneecap to shinbone). Tr. 499.

Dr. Williamson reported that Plaintiff's medications were naproxen (pain reliever), lisinopril (lowers blood pressure) and Synthroid (thyroid).  Tr. 499.  His concluding impressions were: chronic cervicalgia (neck pain), a history of ACDF at the cervical spine (surgery to remove herniated or degenerative disc in the neck area), chronic low back pain, chronic knee pain, vision deficits at the right eye, and a history of optic neuritis (inflammation of the optic nerve causing pain with eye movement and temporary vision loss in one eye).  Tr. 499.

Plaintiff presented at Pompano Adult Clinic on December 3, 2015 as a new patient and was examined by Shawnette Saddler, M.D.  Tr. 572-84.  Dr. Saddler reported that Plaintiff presented for a general exam, and her general health status was described as good.  Tr. 572.  Further, Dr. Saddler noted that Plaintiff had very dry skin over her eyelids and right elbow that had become more bothersome over past months and that Plaintiff needed medication refills.  Tr. 572.  In particular, Dr. Saddler wrote that Plaintiff "has no other complaints today."  Tr. 572.  Following physical examination, Dr. Saddler reported that Plaintiff was alert and oriented, pupils were equal, round and reactive to light, and that extraocular movements were intact.  Tr. 574.  Dr. Saddler also reported that musculoskeletal examination indicated a normal range of motion and normal strength and noted for the neurological assessment that Plaintiff was alert, oriented and had no focal deficits.  Tr. 574.  Dr. Saddler's discharge diagnosis listed: chronic back pain, visual disturbance, history of optic neuritis, hypertension, onychomycosis (fungal nail infection), seborrheic

dermatitis (itchy rash), hypothyroidism, and seasonal allergies along with Plaintiff's prescribed medications.  Tr. 581-83.

State Agency Consultative Examiner, Robert Whittier, M.D., performed a review of Plaintiff's file on January 4, 2016.  Tr. 91-108.  Dr. Whitaker opined that Plaintiff had no past relevant work but had an RFC to perform light work with the following exertional limitations: occasionally lifting and/or carrying 20 pounds, frequently lifting and/or carrying 10 pounds, standing and/or walking for a total of approximately 6 hours in an 8-hour workday, sitting for a total of approximately 6 hours in an 8-hour workday, and unlimited, other than previously specified, pushing and/or pulling.  Tr. 97-98, 106-07.  In addition, Dr. Whitaker considered Plaintiff's allegations of impairments, including blind spots in the right eye from optic neuritis, and found that, relative to vision impairment, Plaintiff's loss of central visual acuity was non-severe, and that Plaintiff had no visual limitations.  Tr. 91, 95, 97, 100, 104, 106.

On January 7, 2016, Plaintiff visited Jacqueline E. Smith, M.D. for an ophthalmic examination complaining of stringy mucous coming from the eyes and blurry vision in both eyes.  Tr. 604-05.  Upon examination, Dr. Smith recorded optic disc atrophy in the right eye (can cause blurry vision), right eye vision of 20/40, left eye vision of 20/25 and stated that plan was to perform diagnostic testing to determine the extent of visual field deficit.  Tr. 604-05.

Plaintiff returned to Dr. Saddler for follow up procedures on January 21, 2016 that were unremarkable.  Tr. 567-71.  On February 4, 2016, Dr. Saddler visited with Plaintiff again and noted that she complained of feelings of depression and a lesion on the nasal bridge that was enlarging and burning.  Tr. 558-66.  Dr. Saddler performed a physical examination and, *inter alia*, again reported that Plaintiff was alert and oriented, pupils were equal, round and reactive to light, and that extraocular movements were intact.  Tr. 560.  Dr. Saddler also reported that a musculoskeletal

7

examination indicated a normal range of motion and normal strength and noted for the neurological assessment that Plaintiff was alert, oriented and had no focal deficits.  Tr. 560.  Dr. Saddler listed discharge diagnoses of high cholesterol, depression, hypertension, lumbar stenosis, seasonal allergies and skin lesion.  Tr. 563.

On February 18, 2016, Plaintiff returned to Dr. Smith for an ophthalmic examination visit.  Tr. 602.  Dr. Smith reported Plaintiff's vision in the right eye at 20/30 and in the left eye at 20/25 and stated that the plan was to prescribe spectacles.  On April 21, 2016, Plaintiff again visited Dr. Smith and reported that she was "good" and had "got[ten] the new glasses."  Tr. 600.  Dr. Smith recorded visual acuity of 20/30 in the right eye (with correction) and 20/20 in the left eye (with correction).  Tr. 600.  On August 30, 2016, Dr. Smith again examined Plaintiff and noted that Plaintiff stated that her "eyes [were] fine, no change, thanks to new glasses."  Tr. 598.  Dr. Smith recorded visual acuity at 20/30 for the right eye and 20/25 for the left eye, with correction.  Tr. 598.

On June 14, 2016, Plaintiff had a chest x-ray pursuant to Dr. Saddler's orders because Plaintiff complained of shortness of breath, Tr. 587-88.  The x-ray indicated a negative chest impression.  Tr. 587.  On June 16, 2016, Plaintiff presented to Dr. Saddler for follow up and was noted to have continuing difficulties with allergies and chronic sinus inflammation with post nasal drainage that was more pronounced at night affecting her ability to sleep. Tr. 548-57.  Following examination, Dr. Saddler noted that Plaintiff had tenderness across the sinuses.  Tr. 550.  Dr. Saddler also noted that Plaintiff's eyes were equal, round and reactive to light with extraocular movements intact.  Further, the musculoskeletal examination indicated a normal range of motion and normal strength.  Tr. 550.  Dr. Saddler noted for the neurological assessment that Plaintiff was alert, oriented and had no focal deficits.  Tr. 550.  Dr. Saddler listed discharge diagnoses of chronic

sinusitis, high cholesterol, hypothyroidism, tinnitus, depression, hypertension, seasonal allergies and back pain.  Tr. 554-55.

On June 27, 2016, Plaintiff returned to Sands Chiropractic Clinic reporting frequent mid and lower bank at a grade 4-5 on a 0 to 10 scale and intermittent neck and upper back pain.  Tr. 590.  On July 6, 2016, Plaintiff returned with persistent pain in left low back and buttock.  Tr. 589.  Dr. Sands noted "possible anterior hip joint involvement may need x-rays for further evaluation."  Tr. 589.

On October 14, 2016, Plaintiff presented to Dr. Saddler for an annual exam and her general health status was described as good, but Plaintiff complained of bilateral foot pains for which she was referred to Podiatry.  Tr. 539-47.  Dr. Saddler again noted that examination of Plaintiff's eyes indicated that pupils were equal, round and reactive to light with extraocular movements intact.  Tr. 541.  The musculoskeletal examination indicated a normal range of motion and normal strength, and Dr. Saddler noted for the neurological assessment that Plaintiff was alert, oriented and had no focal deficits.   Tr. 541.  Dr. Saddler noted back pain as an active problem (Tr. 540) and listed discharge diagnoses of hypothyroidism, seasonal allergies, hypertension, high cholesterol, depression and foot pain.  Tr. 544-45.

Plaintiff had a follow-up appointment with Dr. Saddler on March 17, 2017.  Tr. 526-38.  Dr. Saddler noted that Plaintiff "ha[d] been doing well," that Plaintiff reported having "left sided mid back pain on and off" and that Plaintiff had been seeing a Chiropractor who provided "some minimal relief."  Tr. 526.  Dr. Saddler recorded Plaintiff's pain score as 6 with a goal of 3.  Tr. 528.  Musculoskeletal and neurological observations were not noted, but eye observations were that "pupils are equal, round and reactive to light."  Tr. 528.  Dr. Saddler listed discharge diagnoses of high cholesterol, hypertension, seasonal allergies, hypothyroidism, depression, and pack pain.

Tr. 531-32.  Dr. Saddler noted that the plan relative to Plaintiff's back pain was to "continue with home exercises as tolerated."  Tr. 530.

Plaintiff visited Dr. Saddler for routine follow-up again on June 12, 2017.  Tr. 519-25. According to Dr. Saddler, Plaintiff reported that she had been doing well and doing better with her diet.  Tr. 519.  Following a physical examination, Dr. Saddler reported that, relative to Plaintiff's eyes, pupils were equal, round and reactive to light.  Tr. 520.  Further, a musculoskeletal examination indicated a normal range of motion and normal strength. Tr. 520.  Dr. Saddler noted for the neurological assessment that Plaintiff was alert, oriented and had normal motor function with no focal deficits.  Tr. 520.   Included in Dr. Saddler's treatment plan for Plaintiff was a note regarding referral "to Podiatry" for foot pain.  Tr. 521.

On. June 20, 2017, Plaintiff presented to Wilson Dumornay, M.D. in Plantation for continuing sinusitis (3 years).  Tr. 677.  Dr. Dumornay determined sinus surgery was necessary, which was to be performed the following day.  Tr. 679.

On July 24, 2017, Plaintiff presented to Broward Health Medical Center for an unremarkable removal of a benign fatty tumor on her back, which removal was performed by Naomi Montague, M.D.  Plaintiff also presented to Broward Health Medical Center again on August 11, 2017 related to her complaints of pain thickened nails to the left foot and was examined by Rafael Lappost, DPM.  Tr. 637.  Dr. Lappost diagnosed onychomycosis (fungal infection of nail) and dispensed medication.  Tr. 637.  Further, Dr. Lappost noted that Plaintiff's muscle strength was 5/5 to bilateral lower extremities and that Plaintiff had a normal range of motion relative to foot and ankle joints.  Tr. 637.  Dr. Lappost's follow-up examination with Plaintiff on October 20, 2017 was unremarkable.  Tr. 647.

On September 6, 2017, Plaintiff returned to Dr. Saddler for medication refills and reported being in a lot of pain that was centered in her lower back with a stabbing sensation in the right buttocks.  Tr. 511-18.  Plaintiff stated that she was unable to sit or stand for prolonged time periods because of the pain and that the pain sometimes limited her activities of daily living.  Tr. 515.  Dr. Saddler further noted that Plaintiff reported feelings of depression related to an inability to find a job.  Tr. 515.  Following examination, Dr. Saddler reported relative to Patient's eyes, that pupils were equal, round and reactive to light.  Tr. 516.  Musculoskeletal examination observations were that Plaintiff had a normal range of motion, normal strength, normal gait and TTP (tenderness) along the lower lumber spine.  Tr. 516.  Dr. Saddler recorded that, relative to Plaintiff's herniation of lumbar intervertebral disc and her continuing low-back pain that was sometimes debilitating, the plan was to refer Plaintiff to a physical therapist for evaluation and treatment.  Tr.  517.

On January 11, 2018, Plaintiff returned to Pompano Adult Clinic for a regular check-up and visited with Phillip George, M.D.  Tr. 684-92.  Plaintiff reported that she could not do much because of back pain and poor endurance and reported chronic knee discomfort.  Tr. 688.  Dr. George recorded Plaintiff's pain score at 7 with a goal of zero.  Tr. 690.  Following physical examination, Dr. George recorded Musculoskeletal findings of: normal range of motion, normal strength and no tenderness.  Tr. 691.  As to Plaintiff's eyes, Dr. George stated that pupils were equal, round and reactive to light.  Tr. 690.  Neurologic findings were that Plaintiff was alert and oriented with no focal deficits.  Tr. 691.  Dr. George reported that Plaintiff's treatment plan included "[d]aily aerobic exercise for 60 minutes," continuation of existing medications, weight loss, orthopedic and psychiatric consultations, and a follow-up visit in 6 months.  Tr. 692.

### C. Hearing Testimony

#### 1. Plaintiff's Testimony

Plaintiff attended a hearing held by the ALJ in this case on June 15, 2018.  Tr. 31.  At the hearing, Plaintiff testified that she spent from May of 2012 until August 2015 "between county jail and Lowell Correctional Institute."[1]  Tr. 39.  Further, Plaintiff testified that her conviction is the biggest impediment to getting an office or administrative job but not as to acquiring a job requiring unskilled labor or labor-type work.  Tr. 42.

Regarding Plaintiff's subjective complaints of pain and limiting conditions, Plaintiff testified that she had spinal cord surgery in 2011, had degenerative disc disorder, went blind in her right eye in 2007 due to optic neuritis and had nerve pain throughout her limbs.  Tr. 42.  The ALJ confirmed that Plaintiff was wearing prescription lenses, but Plaintiff did not know to what extent they corrected her vision.  Tr. 43.  Plaintiff testified that her depth perception "[was] off, due to the right eye."  Tr. 48.  Plaintiff explained that everything is "a little blurred and colors are not primary; they're muted."  Tr. 48.  She also confirmed that this impairment exists even with her glasses on.  Tr. 58.

The ALJ confirmed that Plaintiff was taking medication for pain.  Tr. 43.  Plaintiff gauged her pain level at an average of 7 on a scale of 1 to 10 and testified that it was getting worse.  Tr. 43-44.  Plaintiff described the pain as being persistent, stabbing pain in her lower back.  Tr. 46.  When standing, Plaintiff said the pain would shoot down both legs and, at times, she could not feel her feet.  Tr. 46.  Plaintiff also testified that she could only bend forward about 15 or 20 degrees without significant pain.  Tr. 55-56.  In response to the ALJ's inquiry, Plaintiff stated that, other than going to the chiropractor and taking pain medication, there was nothing that she was doing

---

[1] Plaintiff provided no medical records for the period that she was detained.

12

for her back problem.   Tr. 46.   Additionally, Plaintiff denied any recent hospitalizations or emergency room visits.  Tr. 47.

Plaintiff further testified that she regularly uses the cane that she had with her at the hearing because Dr. George at the Pompano Beach Adult Clinic told her to get one and to start using it "about six months [prior]."  Tr. 44-45.  Plaintiff alleged that she could only walk about 100 feet using the cane before having to sit.  Tr.48-49.  Without the cane, Plaintiff estimated that she could walk about 25 feet.  Tr. 49.  Plaintiff testified that she could lift about 7 or 8 pounds and could extend her arms out in front of her but could not lift anything at the same time.  Tr. 49.

Plaintiff demonstrated at the hearing that she could raise her arms above shoulder level. Tr. 49.  Plaintiff also acknowledged that she could pick up coins from a table but would need help getting her cane up from the floor if she dropped it.  Tr. 50.  Also, in response to inquiry from her counsel, Plaintiff testified that she could not kneel, that she could not climb stairs, that her knees would go out if she stooped to get something and that she could not crawl.   Tr. 55-58.  Further, all such movements caused her great pain.  Tr. 57-58.

As far as activities of daily living, Plaintiff stated that she could dress and shower and prepare a sandwich to eat but that she lived with her mother, and they hired a neighbor to do housekeeping and laundry.  Tr. 51.  Plaintiff alleged that she rarely went to the grocery store and that a close friend did her shopping for her.  Tr. 51.  However, when questioned by her attorney as to whether she used a mobile cart at the supermarket, Plaintiff responded "I should, but pride has been an issue with that. . . . I'm reaching the point where I'm going to have to."  Tr. 60.

Plaintiff also reported that she had a laptop and spent a couple hours per day online, but she said that she did so for no more than ten (10) minutes, or fifteen (15) minutes max, at a time because she could not sit that long without her back seizing up.  Tr. 52-53, 59.  Frequent bathroom

usage, however, facilitated her laptop use by breaking up the time that she spent sitting.  Tr. 53.
As to other activities, Plaintiff testified that she read, did jigsaw puzzles and played board games
with her mother, and cared for her cat and dog.  Tr. 52-53.

### 2. VE's Testimony

After testifying that Plaintiff had prior work experience as a vocational rehabilitation
counselor, the VE answered certain hypothetical questions posed by the ALJ.  Tr. 62-69.  First,
the ALJ asked the VE whether an individual with Plaintiff's age, education, and work experience,
capable of performing at a light exertional level – frequently climbing ramps or stairs; occasionally
climbing ladders, ropes, or scaffolds; frequent balancing, stooping, kneeling, crouching, or
crawling – could perform Plaintiff's past work.  Tr. 63.  The VE testified that the hypothetical
individual could perform Plaintiff's past work as actually performed and as generally performed.
Tr. 63.  The VE also testified that such an individual could perform other work, such as the job of
a rental clerk (52,000 jobs), a counter clerk (50,000 jobs) or a cashier II (850,000 jobs) and that
such testimony was consistent with the Dictionary of Occupational Titles ("DOT").  Tr. 64.

In response to the ALJ's second hypothetical question, where a person described in the first
hypothetical alternated sitting and standing every 20 to 30 minutes throughout the work day in
order to change position without leaving the work station, the VE testified based on her past
experience that such a person could still perform the sedentary job of vocational rehabilitation
counselor as generally performed.  Tr. 64-65.  The VE also testified that such a person could
perform the job of booth cashier (23,000 jobs), counter clerk and rental clerk based on the VE's
experience and knowledge of the jobs.  Tr. 65-66.

Third, the ALJ asked the VE to assume a hypothetical individual of Plaintiff's age,
education, and work experience, who could perform at a sedentary exertional level with the sit-

stand limitations described above. Tr. 66. The VE confirmed, in response to the ALJ's inquiry as to whether this hypothetical person could perform Plaintiff's past work, that such a person could perform the work as it is generally performed. Tr. 67. Additionally, the VE testified that, consistent with the DOT (except for the sit-stand option) and based upon the VE's knowledge, such a person could perform the work of food and beverage order clerk (33,000 jobs), document preparer (57,000 jobs), and telephone information clerk (31,000 jobs). Tr. 67-68.

Fourth, the ALJ changed the third hypothetical described above to add the limitation of being off task 20 percent of the work day. Tr. 68. The VE testified that this hypothetical person could not perform Plaintiff's past work and could not perform any other work in the national economy. Tr. 68. Plaintiff's counsel asserted at the hearing that Plaintiff fit under this fourth hypothetical and was, therefore, disabled. Tr. 69.

## STANDARD OF REVIEW

In reviewing claims brought under the Social Security Act, a court's role is limited. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The Commissioner's findings of fact must be affirmed if they are based upon "substantial evidence." *See* 42 U.S.C. 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). "Substantial evidence is . . . such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Moore*, 405 F.3d at 1211 (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004)). Courts "may not decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Bloodsworth*, 703 F.2d at 1239. In addition to determining whether the Commissioner's factual findings are supported by substantial evidence, courts must determine whether the ALJ applied the correct legal standards. *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

## DISCUSSION

### I.     THE SEQUENTIAL EVALUATION

A "disability" is defined as an inability "to engage in any substantial gainful activity ("SGA") by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  In making a disability determination, "the ALJ must consider the evidence in its entirety, including: (1) objective medical facts or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant . . . and (4) the claimant's age, education, and work history." *Maffia v. Comm'r of Soc. Sec.*, 291 F. App'x 261, 262-63 (11th Cir. 2008) (quoting *DePaepe v. Richardson,* 464 F.2d 92, 94 (5th Cir.1972)).  *See also Walden v. Schweiker*, 672 F.2d 835, 839 (11th Cir. 1982).

To arrive at a determination as to disability, the ALJ must undertake the sequential evaluation embodied in 20 C.F.R. § 404.1520.  This process requires that the ALJ first determine whether the claimant is presently engaged in SGA.  20 C.F.R. § 404.1520(b).  If so, a finding of "no disability" is made.

If the claimant is not engaged in such work, then the ALJ must proceed to the second step and determine whether the claimant suffers from a "severe impairment."  An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c).  If no severe impairment is found, then the ALJ will conclude that there is no disability; if a severe impairment is found, then the ALJ will proceed to the next step of the analysis.  *See id.*

The third step requires the ALJ to determine whether the claimant's impairment meets or equals those listed in Appendix 1 of the Regulations. 20 C.F.R. § 404.1520(d). If so, the ALJ will find the claimant disabled without considering age, education, and work experience. *Id.* If not, the inquiry will proceed to the next stage.

Step four requires the ALJ to determine whether the claimant has the residual functional capacity ("RFC") to perform past relevant work. 20 C.F.R. § 404.1520(e). The Regulations define RFC as "the most you can still do despite your limitations." 20 C.F.R. § 404.1545(a)(1). This determination takes into account "all of the relevant medical and other evidence," including the claimant's own testimony and the observations of others. 20 C.F.R. § 404.1545(a)(3). The ALJ must then compare the RFC with the physical and mental demands of the claimant's past relevant work to determine whether the claimant is still capable of performing that kind of work. If so, the claimant is found not disabled. 20 C.F.R. § 404.1520(f).

If the claimant establishes an inability to return to past relevant work, the inquiry turns to step five. "At step five the burden of going forward shifts to the [Commissioner] 'to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.'" *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). If the Commissioner points to possible alternative employment, then the burden returns to the claimant to prove an inability to perform those jobs. *Id.* At this fifth and final step, the ALJ must resolve whether the claimant is actually capable of performing other work. *See* 20 C.F.R. §§ 404.1520(g), 404.1560(c).

To help evaluate whether sufficient jobs exist that can be performed given the claimant's age, education, and physical limitations, the Commissioner has promulgated Medical Vocational Guidelines. *See* 20 C.F.R. § 404, subpt. P, app. 2. The guidelines may apply "where a person is

not doing SGA and is prevented by a severe medically determinable impairment from doing vocationally relevant past work." 20 C.F.R. § 404.1569. The guidelines are composed of detailed grids and rules, which direct a finding of disabled or not disabled based on a claimant's RFC, age, education, and previous work experience. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987).

Yet, the guidelines "do not cover all possible variations of factors" and are inapplicable "if one of the findings of fact about the person's vocational factors and [RFC] is not the same as the corresponding criterion of a rule." 20 C.F.R. § 404.1569. Therefore, "[e]xclusive reliance on the grids is not appropriate *either* when [the] claimant is unable to perform a full range of work at a given residual functional level *or* when a claimant has non-exertional impairments that significantly limit basic work skills." *Phillips v. Barnhart*, 357 F.3d 1232, 1242 (11th Cir. 2004) (citation omitted). *See also Walker*, 826 F.2d at 1002-03; *Hargis v. Sullivan*, 945 F.2d 1482, 1490 (10th Cir. 1991). Nevertheless, in such situations, the guidelines may serve as a framework to determine whether sufficient jobs exist within a claimant's range of RFC. *Hargis*, 945 F.2d at 1490. However, the Commissioner may carry his or her burden through the use of a VE when exclusive reliance on the guidelines is not appropriate. *Chaney-Everett v. Astrue*, 839 F. Supp. 2d 1291, 1299 (S.D. Fla. 2012) (citing *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *Walker*, 826 F.2d at 1003). A VE provides the ALJ with a realistic appraisal of the work that a claimant is capable of performing. *Id.* (citing *Walker*, 889 F.2d at 50).

## II.   ALJ'S APPLICATION OF THE SEQUENTIAL EVALUATION

After considering the evidence, the ALJ found that Plaintiff was able to perform past relevant work as generally performed through the date of the decision (which includes the Date Last Insured) and could have performed other work that existed in significant numbers in the

national economy.  Tr. 21-22.  Therefore, the ALJ concluded that Plaintiff was not disabled at any time between the Alleged Onset Date and the date of the decision.  Tr. 22.

Preliminarily, the ALJ found that Plaintiff last met the insured status requirements of the Social Security Act on the Date Last Insured.  Tr. 17.  Accordingly, as the ALJ noted, Plaintiff was required to "establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits" (DIB).  Tr. 15.  *See also Moore*, 405 F.3d at 1211 ("For DIB claims, a claimant is eligible for benefits where she demonstrates disability on or before the last date for which she w[as] insured. 42 U.S.C. § 423(a)(1)(A) (2005). Because Moore's last insured date was December 31, 1997, her DIB appeal requires a showing of disability on or before that date.").  Further, for SSI, Plaintiff had to establish disability between the date of application and the date of the ALJ's decision.  *Id.*

Addressing the first step in the sequential evaluation, the ALJ found that Plaintiff had not engaged in SGA since the Alleged Onset Date.  Tr. 17.  At step two, the ALJ found that Plaintiff had the following severe impairments: spine disorders and dysfunction-major joints.  Tr. 17.  Also, at step two, the ALJ determined that Plaintiff's "hypertension, loss of central visual acuity and obesity, considered singly, and in combination, [did] not cause more than minimal limitation in [Plaintiff's] ability to perform basic work activities and [were] therefore non-severe."  Tr. 18.  The ALJ then found at step three that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. 18.  The ALJ explained, in part, that Plaintiff "neither established that [she] is unable to ambulate effectively, nor established that [she] is unable to perform fine and gross movements effectively."  Tr. 18.  Further the ALJ explained that the record did not show compromise of a nerve root or the spinal cord with evidence of nerve root

compression, spinal arachnoiditis (inflammation of a membrane surrounds and protects the nerves of the spinal cord), or lumbar spinal stenosis resulting in pseudoclaudication (spinal canal narrowing putting pressure on nerve roots). Tr. 18.

The ALJ next assessed Plaintiff's RFC. Specifically, the ALJ determined that Plaintiff had the RFC to perform light work except occasionally climbing ramps or stairs; never climbing ladders, ropes or scaffolds; occasionally balancing, stooping or kneeling; never crouching or crawling; and must alternate sitting and standing every 20 to 30 minutes throughout the workday in order to change position but without leaving the workstation for a brief positional change. As part of this assessment, the ALJ considered all of the evidence, including Plaintiff's reported symptoms. Tr. 18-22. The ALJ, however, discounted Plaintiff's subjective complaints, finding that:

> [while Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms[,] . . . the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

Tr. 19.

In making the RFC finding, the ALJ did not assign a specific weight to the September 11, 2015 opinion of the CE, Dr. Williamson. Tr. 20. The ALJ did, however, detail his findings, including Dr. Williamson's observations that Plaintiff had range of motion deficits at the cervical spine, that the iliac crest was elevated at the left, that Plaintiff had positive tenderness at the sacral sulci, that there was anterior carriage of the head, that Plaintiff had positive tenderness at the articular pillars, at the midline at the cervicothoracic junction and at the medial joint line at the knees. Tr. 20. In addition, the ALJ noted that Dr. Williamson observed that Plaintiff "did not appear acutely ill, . . . ambulated independently . . . [and had] visual acuity at [the] left eye [of]

20/30 and [at the] right eye [of] 20/30 with corrective lenses," had "no range of motion deficits at the upper or lower extremities," had a normal grip, "5/5 strength grossly at the upper and lower extremities . . . was able to perform standing on the toes and standing on the heels," could perform tandem walking, and Plaintiff's "sitting straight leg raise was negative." Tr. 20.

The ALJ also noted that "State Agency physicians reviewed the claimant's records and found the claimant could perform light work" citing exhibits 1A, 2A, 7A and 8A.[2] Tr. 20. The ALJ reported that "he [gave] this partial weight." Tr. 20. Further, the ALJ stated that "[he] would give [Plaintiff] postural limitations due to her testimony of the pain she has in her back and other joints." Tr. 20. In sum, the ALJ found evidence that "[Plaintiff's] daily activities along with the objective medical evidence. . . establish[ed] that [Plaintiff] ha[d] a greater sustained capacity than she alleg[ed]." Tr. 20. For that reason, the ALJ concluded that "[Plaintiff's] subjective complaints and alleged limitations [were] not fully persuasive and that she retain[ed] the capacity to perform work activities with [postural] limitations." Tr. 20-21.

After assessing Plaintiff's RFC, the ALJ proceeded to step four and considered whether Plaintiff had the ability to perform her past relevant work as a vocational rehabilitation counselor. Tr. 21. The ALJ reviewed the evidence and compared the functioning of Plaintiff with the requirements of her past work. Tr. 21. After doing so, the ALJ concurred with the VE that Plaintiff could perform past relevant work as it is generally performed. Tr. 21.

---

[2] Exhibits 1A and 2A (Tr. 71-86) pertain to an evaluation by a state agency single decisionmaker or SDM. However, the "SDM" designation denotes no medical credentials, and the forms completed by such a reviewer are not to be considered medical opinion evidence at the appeals level. *See Siverio v. Comm'r of Soc. Sec.*, 461 F. App'x 869, 871–72 (11th Cir. 2012). Exhibits 7A and 8A pertain to the previously discussed review of Plaintiff's file that state agency physician, Robert Whittier, M.D., performed on January 4, 2016. Tr. 91-108.

Although determining that Plaintiff could perform her past relevant work, the ALJ alternatively considered (at step five) Plaintiff's age, education, and work experience, in conjunction with the Medical-Vocational Guidelines, to determine whether a significant number of jobs, that Plaintiff could perform, existed in the national economy.  Tr. 21-22.  The ALJ noted that Plaintiff was 48 years old on the Alleged Onset Date, which is defined as an individual closely approaching advanced age under 20 C.F.R. §§ 404.1563 and 416.963.  Tr. 21.  He also noted that Plaintiff had at least a high school education and that she was able to communicate in English.  Tr. 21.  However, the ALJ noted that, because Plaintiff's ability to perform substantially all of the requirements of light work was impeded by additional limitations, the ALJ relied on testimony from the VE to determine whether jobs existed in the national economy for an individual with Plaintiff's age, education, work experience, and RFC.  Tr. 22.  The VE identified three representative occupations that such an individual could perform: booth cashier; counter clerk; and rental clerk.  Tr. 22.  The ALJ found that the VE's testimony was consistent with the DOT.  Tr. 22.  Therefore, the ALJ concluded that Plaintiff "ha[d] not been under a disability, as defined in the Social Security Act, from [the Alleged Onset Date], through the date of [his] decision."  Tr. 22.

## III.   ANALYSIS OF ISSUES

Plaintiff argues that the ALJ erred for two separate reasons.  First, she asserts that the ALJ committed error prejudicing Plaintiff by not assigning a weight to the medical opinion of the consultative examiner, Dr. Williamson.  (DE 18 at 3).  Second, Plaintiff argues that the ALJ committed error in formulating Plaintiff's RFC by: 1) failing to quantify the duration of brief positional changes between sitting and standing; 2) failing to specify how many hours per day or days per week that Plaintiff could perform SGA; and 3) failing to include Plaintiff's non-exertional visual limitations in arriving at Plaintiff's RFC.  *Id.*

**A. Whether the ALJ's Failure to Weight Dr. Williamson's Medical Opinion is Reversible Error**

Plaintiff asserts that the ALJ ignored the medical opinion of Dr. Williamson and that the ALJ, in any event, cannot reject portions of a medical opinion without providing a reasoned explanation for doing so.  (DE 18 at 5-6.)  Plaintiff relies on the holding in *Winschel v. Commissioner*, 631 F.3d 1176, 1178-79 (11th Cir. 2011), which requires the ALJ to state with particularity the weight given to medical opinions and to explain the reasons for the weight assigned.  (DE 18 at 6).  Defendant responds that, even though the ALJ did not assign a weight to Dr. Williamson's opinion, Plaintiff failed to show that the ALJ's findings are inconsistent with that opinion; therefore, this failure is at most a harmless error.  (DE 20 at 6-8).  Defendant relies on findings in unpublished Eleventh Circuit cases stating that, even though an ALJ does not explicitly state the weight he affords a medical opinion, if the opinion does not contradict the ALJ's findings, then this error is harmless.  *Id.* at 6-7 (citing, among other cases, *Colon v. Colvin*, No. 15-14547, 2016 WL 4727993, at *2 (11th Cir. Sept. 12, 2016); and *Wright v. Barnhart*, 153 F. App'x 678, 685 (11th Cir. 2005)).

Additionally, Defendant argues that Plaintiff's failure in the instant case to demonstrate reversible error is the same as found in *Hunter v. Comm'r of Soc. Sec.*, 609 F. App'x. 555, 558 (11th Cir. 2015).  (DE 20 at 8).  The Court in *Hunter* reasoned that because the ALJ had summarized treatment notes by doctors whose opinions were not weighted, and because those doctors had not provided opinions on the claimant's ability to perform past work, the ALJ's failure to assign them weight did not affect the ALJ's ultimate decision.  *Hunter*, 609 F. App'x at 558. The Court held that "[t]o the extent that an administrative law judge commits an error, the error is

harmless if it is does not affect the judge's ultimate determination."  *Id.* (citing *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir.1983)).

Plaintiff replies that the error was not harmless because: 1) the ALJ found that Plaintiff's loss of central visual acuity (tested with conventional eye charts) was a medically determinable impairment, and 2) Dr. Williamson diagnosed the Plaintiff with vision deficits in the right eye and a history of optic neuritis, which the ALJ did not specifically discuss in rendering Plaintiff's RFC and in finding that Plaintiff could perform her past relevant work and other jobs identified by the VE that require "frequent near acuity" (vision at 20 inches or less).[3]  (DE 21 at 2; 5-8); *see also* Tr. 498-99.  For the reasons set forth below, the undersigned agrees with Defendant that the ALJ's failure to weight the opinion of Dr. Williamson is harmless error.

First, this case is analogous to *Hunter*, as the ALJ did consider (albeit not explicitly weight) Dr. Williamson's conclusions, and Dr. Williamson did not provide any medical opinion as to how Plaintiff's medical conditions would impact her ability to perform her past relevant work. As previously discussed, while the ALJ did not weight Dr. Williamson's opinion, the ALJ's decision summarized the opinion in detail, including that Plaintiff exhibited, *inter alia*, "range of motion deficits at the cervical spine" and exhibited tenderness "at the sacral sulci" . . . at the articular pillars . . . [and] at the midline at the cervicothoracic junction as well as "medial joint line tenderness at the knees."  (DE 20 at 10); Tr. 20.  "[T]he mere existence of these impairments[, however,] does not reveal the extent to which they limit her ability to work or undermine the ALJ's determination in that regard."  *Moore*, 405 F.3d at 1213, n. 6.  Unlike the state agency physician, who found Plaintiff capable of light work and whose opinion the ALJ gave partial weight, Dr.

---

[3] *See* Selected Characteristics of Occupations, at Appendix C at C-4.

Williamson did not opine as to Plaintiff's "work-related abilities in light of the existing medical conditions." *Hunter*, 609 F. App'x at 558. Therefore, as in *Hunter*, the ALJ did consider Plaintiff's medical condition as a whole (including Dr. Williamson's findings), and Dr. Williamson's opinion did not conflict with, or affect, the ALJ's findings. *Id.*

Second, Plaintiff asserts in her reply that the ALJ's error was harmful specifically in his failure to adequately assess and incorporate Plaintiff's visual impairment into her RFC. However, the ALJ did consider her visual impairments, including those discussed by Dr. Williamson. Plaintiff testified that her vision was blurry even with glasses on, and she claims that she lacks ability to perform the "frequent near acuity" (clarity of vision at 20 inches or less) necessary to perform her past relevant work or any of the other jobs identified by the VE. (DE 21 at 4-8). In support, Plaintiff proffers that Dr. Williamson found that she had vision deficits in the right eye and a history of optic neuritis. Because the ALJ did not specifically cite to this portion of Dr. Williamson's opinion, Plaintiff presumes that the ALJ did not consider these findings in determining the RFC and objects to this omission. (DE 21 at 5-6); Tr. 20.

Contrary to Plaintiff's assertion, however, the ALJ considered Plaintiff's medical condition as a whole and reconciled Plaintiff's subjective complaints about her vision with the evidence of record, which included Dr. Williamson's opinion. In rendering his decision, the ALJ was not required to recite Dr. Williamson's opinion in full regarding Plaintiff's vision. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (stating that an ALJ's decision is not required to reference every piece of evidence so long as the decision is not a broad rejection of the medical evidence of record). Rather, the ALJ summarized Dr. Williamson's finding as to Plaintiff's visual acuity, noting that Dr. Williamson found Plaintiff's vision in both eyes was 20/30 with corrective lenses. Tr. 20. Further, the ALJ explicitly stated that he considered all of Plaintiff's symptoms in

formulating her RFC.  Tr. 18.  However, the ALJ determined – with support from the record – that Plaintiff's "subjective complaints and alleged limitations [were] not fully persuasive and that [Plaintiff] retain[ed] the capacity to perform work with the limitations as set forth."  Tr. 18-21. For example, the ALJ noted Plaintiff's visit in August 2016 with Dr. Smith that came almost a year after her September 2015 visit with Dr. Williamson, where Plaintiff reported that her eyes were fine thanks to her new glasses.  Tr.18.   The ALJ also found that Plaintiff was able to drive short distances.  Tr. 19.  Furthermore, Plaintiff herself testified that she read, did jigsaw puzzles, played board games, and spent a couple hours per day online using her laptop, all of which implicates an ability to perform "frequent near acuity."  Tr. 52-53.  *See Wilson v. Comm'r of Soc. Sec.*, 500 F. App'x. 857, 859 (11th Cir. 2012) (stating that an ALJ's credibility finding will not be disturbed on appeal when clearly articulated and supported by substantial record evidence).

In sum, the record indicates that the ALJ considered all of the record evidence, including Dr. Williamson's opinion (about both her vision and other impairments), in formulating Plaintiff's RFC.  Also, as previously explained, Dr. Williamson did not opine as to Plaintiff's work-related abilities.  Therefore, his opinion does not conflict with the ALJ's RFC findings.  Accordingly, as in *Hunter*, Dr. Williamson's opinion does not change the ALJ's ultimate determination in this case, and Plaintiff fails to demonstrate reversible error based on the ALJ's failure to state the weight given to Dr. Williamson's opinion.

**B.  Whether ALJ Erred in Formulating Plaintiff's RFC**

Plaintiff alleges that the ALJ's RFC finding is not based upon substantial evidence because the ALJ: 1) failed to quantify the time needed for brief positional changes during the workday; 2) failed to specifically state the number of hours per day or days per week that Plaintiff could

perform SGA; and 3) failed to include Plaintiff's non-exertional visual limitations in arriving at the RFC.  The undersigned disagrees for reasons discussed herein.

Plaintiff's first argument, that the RFC is flawed due to vagueness for failure to state the amount of time required for Plaintiff's position changes during the workday, is unavailing.  The ALJ asked the VE, in a hypothetical regarding Plaintiff's past work, for the VE to assume that the individual "[m]ust alternate sitting and standing every 20 to 30 minutes throughout the work day in order to change position but *without leaving the work station*."  Tr. 64 (emphasis added).  The VE then asked: "Sitting and standing every 30 minutes?"  Tr. 64.  The ALJ confirmed stating: "Every 20 to 30 minutes, just alternating for a brief change in position."  Tr. 64-65.  The VE then acknowledged that Plaintiff's past work as a vocational rehabilitation counselor was a sedentary job and stated, based on her experience: "I think there would be the opportunity, within the 20 to 30 minutes, just to stand up for a brief change" as the job is generally performed.  Tr. 65.

Plaintiff implies in her reply that brief positional changes could put her off task 20% of the work day, which would render her disabled.  (DE 21 at 10).  Plaintiff does not state how much time she would require but suggests that, "[i]f [she] were to change position every 20 minutes to alleviate the pain from her physical medical impairments, and if each positional change took four minutes to occur," then she would be off task 20% of the work day.  *Id.*  In support, Plaintiff notes that the VE testified, in response to the ALJ's inquiry, that an individual consistently off task 20% of the time could not maintain a job.  (DE 21 at 10); Tr. 68.  As Plaintiff's references to the hearing testimony demonstrate, both the VE and ALJ were aware that a "brief change" of such duration as to put an individual off task 20% or more of the work day would render her disabled.  Yet, the ALJ, based upon the VE's testimony, found that Plaintiff was not disabled.  Additionally, nothing in the evidence of record indicates that Plaintiff would need four minutes or more to complete

changes in position, and Plaintiff does not argue that such evidence exists.  Accordingly, the undersigned finds Plaintiff's argument unpersuasive in this regard.

Furthermore, Courts uphold with regularity an ALJ's RFC finding for light work that is based upon VE testimony regarding sit/stand options pertaining to the jobs identified.  *See Vanhorn v. Comm'r of Soc. Sec.*, No. 6:19-CV-31-ORL-LRH, 2020 WL 998724, at *8 (M.D. Fla. Mar. 2, 2020) (collecting cases affirming that an ALJ properly follows guidelines set forth in SSR 83-12 when a VE testifies that jobs identified are compatible with a sit/stand option based on the VE's experience).  Here, the ALJ posed a hypothetical regarding jobs in the national economy assuming an individual of Plaintiff's age, education and relevant past work history and further assuming a light exertional level; occasionally climbing ramps or stairs; never climbing ladders, ropes, or scaffolds; occasionally balancing, stooping, or kneeling; never crouching, or crawling and requiring the ability to alternate sitting and standing every 20 to 30 minutes throughout the work day in order to change position but without leaving the work station.  Tr. 63-65.  The VE testified that jobs existed for such an individual in the national economy and explicitly stated that these jobs "have the ability to sit and stand," namely the jobs of booth cashier, counter clerk and rental clerk. Tr. 65-66.  These are the same jobs that the ALJ identified in rendering his opinion that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  Tr. 22.  Therefore, the undersigned concludes that the ALJ's hypothetical questions to the VE as to a brief change in position were not vague and that the VE's testimony in this regard constituted substantial evidence to support a finding that Plaintiff is not disabled.

Second, Plaintiff's argument, that the RFC is flawed because the ALJ failed to set forth the number of hours per day or the number of days per week that Plaintiff could perform SGA, is also

unavailing.  In finding that Plaintiff could perform her past work – which ample evidence showed required working eight hours a day and five days a week – the ALJ implicitly found that Plaintiff could perform SGA for that same duration. A claimant's Work History Report along with the testimony of a claimant regarding her past work, the testimony of a VE, and the DOT all combine to provide a picture of a claimant's past relevant work sufficient to compare the claimant's abilities to the demands of that work. *Holder v. Soc. Sec. Admin.*, 771 F. App'x 896, 899–900 (11th Cir. 2019).  Here, the ALJ specifically asked the VE whether she had the opportunity to review Plaintiff's file and to listen to Plaintiff's testimony regarding her work history, and the VE said "yes."  Tr. 63.  Plaintiff stated in her work history that she worked 8 hours per day and 5 days per week as a vocational rehabilitation counselor.  Tr. 255-56.  She also described in detail the physical demands of the job and the nature of the work done.  Tr. 256.  In response to the ALJ's inquiry, the VE then testified that Plaintiff's prior work was as a vocational rehabilitation counselor and provided the DOT listings.  Tr. 62-63.  "The DOT contains detailed descriptions of the duties and physical requirements associated with each occupation, as generally performed in the economy." *Holder*, 771 F. App'x at 900.  Thus, the ALJ adequately developed the record and "there was ample evidence in the record about the demands of [Plaintiff's] past work," including temporal demands.  *Id.* at 899.  Based upon testimony from the VE, the ALJ found that Plaintiff could perform her past relevant work.  Implicit in this finding is that Plaintiff could work 8 hours per day and 5 days per week.  Therefore, the undersigned does not find Plaintiff's argument meritorious.

Third, Plaintiff's argument that the ALJ committed reversable error by failing to consider Plaintiff's visual limitations and failing to perform a function-by-function analysis under SSR 96- p likewise fails.  (DE 18 at 10).  "[T]he Eleventh Circuit has repeatedly rejected similar claims that an ALJ's failure to perform an explicit function-by-function assessment under SSR 96-8p is

an error of law mandating reversal, so long as the ALJ's decision sufficiently indicates that he or she considered all relevant evidence in arriving at an RFC determination." *Aldao v. Colvin*, No. 14-22726-CIV, 2016 WL 1236899, at *4 (S.D. Fla. Mar. 30, 2016) (citations omitted).  Here, contrary to Plaintiff's contention that the ALJ failed to consider an ophthalmic examination done on January 7, 2016 by Dr. Smith, the ALJ explicitly stated that he carefully considered the entire record and considered all of Plaintiff's symptoms and the extent to which they could be accepted as consistent with the medical evidence of record.  Tr. 18.  As explained above, the ALJ is not required to refer to every piece of evidence as long as he considers the claimant's medical condition as a whole.  *Dyer*, 395 F.3d at 1211.  Here, the ALJ specifically commented on the most recent examination of Plaintiff by Dr. Smith in August of 2016.  Plaintiff references prior visits to Dr. Smith where Plaintiff complained of blurry vision and "a lot of trouble with [her] right eye."  (DE 21, at 3).  However, whatever symptoms Plaintiff complained of at these prior visits, the evidence indicates that those symptoms were largely corrected by the time of this last visit.  Specifically, in August 2016, Plaintiff said to Dr. Smith, that "her eyes were fine . . . thanks to her new glasses." Tr. 18.  Because the record indicates that the ALJ considered Plaintiff's medical condition as a whole, the undersigned does not credit her argument that the ALJ was required to perform a function-by-function analysis.

In sum, the undersigned finds that the ALJ considered all of the evidence in evaluating Plaintiff's complaints and that the ALJ resolved inconsistencies or conflicts between those statements and the record consistent with 20 C.F.R. § 404.1529.  Furthermore, there is substantial evidence to support the ALJ's RFC determination.  Accordingly, the undersigned concludes that the ALJ's denial of benefits in this case is supported by substantial evidence.

## CONCLUSION

For the reasons discussed above, the undersigned **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion (DE 18) and **GRANT** Defendant's Motion (DE 19).

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND SUBMITTED** in Fort Lauderdale, Florida on this 3rd day of August 2020.

Jared M. Strauss
United States Magistrate Judge

Copies furnished via CM/ECF to:

Hon. Federico A. Moreno

Counsel of record

31